IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| ORLEAN E. NEWBY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No.  3:14cv459 (REP) |
| | ) | |
| BON SECOURS ST. FRANCIS FAMILY | ) | |
| MEDICINE RESIDENCY PROGRAM, | ) | |
| *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Orlean E. Newby, M.D. ("Plaintiff") brings this suit under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Civil Rights Act of 1866, 42 U.S.C. § 1981, against Bon Secours St. Francis Family Medicine Residency Program ("Residency Program") and under 42 U.S.C. § 1983 against Paul V. Jackson, M.D. and Victor H. Agbeibor, M.D. (collectively "Defendants"), former and current residency directors with the Residency Program, respectively. Plaintiff contends that, during her participation in the Residency Program, she endured race discrimination, gender discrimination, unwanted sexual advances and retaliation for complaints of working hours in excess of established guidelines under the American Council for Graduate Medical Education ("ACGME"). Dr. Jackson and Dr. Agbeibor move to dismiss Plaintiff's § 1983 claims, arguing that Plaintiff fails to identify a protected property interest and does not establish that Defendants' conduct constituted state action.

The matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on Defendants' Motion to Dismiss (Defs.' Mot. to Dismiss) (ECF No. 8).  For the reasons set forth below, the Court recommends that Defendants' Motion to Dismiss be GRANTED and that Counts VI and VII be DISMISSED.

## I.    BACKGROUND

The Court construes the allegations in the Complaint in favor of the non-moving party, as required when resolving a motion for judgment on the pleadings.  Fed. R. Civ. P. 12(c); *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 591 (4th Cir. 2004) (citations omitted).  Viewing the facts through such a lens, the Court has concluded that the facts are as follows.

Plaintiff graduated from Florida A&M University School of Pharmacy in 1995 and Ross University School of Medicine in St. Kitts, West Indies in 2008. (Compl. ¶ 7.)  Plaintiff passed two board examinations before beginning her residency on July 1, 2010.  (Compl. ¶¶ 7-8.)  The Residency Program lasts three years and requires residents to complete graded rotations in various areas of medicine and to pass several national examinations. (Compl. ¶ 9.) The Residency Program provides residency contracts to residents each year that typically last from July through June. (Compl. ¶ 10.)  Plaintiff entered into a Residency Employment Agreement, PGY-1, on April 27, 2010, for a term lasting from July 1, 2010 through June 30, 2011.  (Compl. ¶ 10.)  Regulations of the ACGME[1] govern all agreements.  (Compl. ¶ 11.)

Dr. Watkins, a faculty member with the Residency Program, invited Plaintiff to a study group in mid-August 2010, approximately six weeks into her first year with the Residency Program. (Compl. ¶ 12.)  The study group convened on August 28, 2010, in the St. Francis Medical Center hospital cafeteria, and Plaintiff, Dr. Watkins, Dr. Jay Shah, a second-year resident and Dr. Gillian Lowe, a first-year resident, attended.  (Compl. ¶ 13.)  During the study group, Dr. Watkins massaged Plaintiff's calf with his foot. (Compl. ¶ 14.)  Dr. Watkins then winked at Plaintiff, and

---

[1]    ACGME is a private organization accrediting approximately 9,500 residency education programs.  The ACGME develops accreditation standards for graduate programs, including guidelines and requirements for programs.  The ACGME is not a government body.

she presumed that the advance was deliberate, but responded disinterestedly to his advances and did not attend any other study sessions.  (Compl. ¶ 14.)

In mid-October 2010, the Residency Program assigned Plaintiff to work with Dr. Watkins and Dr. Rupen Amin, the third-year medical chief resident in the Family Medical Services rotation at the St. Francis Medical Center.  (Compl. ¶ 16.)  During this rotation, Plaintiff alleges that Dr. Watkins and Dr. Amin failed to provide guidance as instructors ridiculed or embarrassed her on several occasions.[2]  (Compl. ¶ 17.)  Following several instances involving Dr. Watkins and Dr. Amin, Plaintiff spoke with Ms. Barbara Lunn, the office manager of the Residency Program. (Compl. ¶ 24.)  Plaintiff believed that Dr. Watkins berated her and damaged her reputation with other faculty members and residents, because Plaintiff rejected Dr. Watkins' sexual advances. (Compl. ¶ 24.)  After this discussion, Ms. Lunn took no further action.  (Compl. ¶ 25.)  On October 27, 2010, Dr. Jackson, then-director of the Residency Program, met with Plaintiff to inform Plaintiff that she failed the Family Medicine rotation and was placed on remediation,[3] but did not discuss her previous complaint to Ms. Lunn.  (Compl. ¶ 27.)

In December 2010, Dr. Jackson offered to remove Plaintiff from the night float shift to ease Plaintiff's schedule because of her two young children.  (Compl. ¶ 29.)  Plaintiff declined, because she did not want to receive any preferential treatment.  (Compl. ¶ 29.)  Dr. Jackson, however, insisted on changing Plaintiff's schedule and assured her that he could make such a change as director of the Residency Program.  (Compl. ¶ 29.)  Plaintiff alleges that Dr. Jackson then informed

---

[2]     Plaintiff alleges several instances where Dr. Watkins and Dr. Amin humiliated or ridiculed her.  Such situations included pretending to use a stopwatch to time Plaintiff so as to simulate a military camp, berating Plaintiff for speaking up in a discussion of whether a particular drug was an NSAID and backing Plaintiff against a wall while yelling at her.  (Compl. ¶¶ 17, 19.)  The "last straw" for Plaintiff occurred when Dr. Watkins allegedly kicked out his leg towards Plaintiff and yelled at her after she had not yet received the results from a laboratory test.  (Compl. ¶ 23.)

[3]     Dr. Jackson suggested that Plaintiff take a remediation course at Eastern Virginia Medical School to prepare for the USMLE Step II (Clinical Skills) medical exam, which Plaintiff previously passed in 2008.  (Compl. at ¶ 27.)

Dr. Amin that Plaintiff had problems completing the night rotation.  (Compl. ¶ 30.)  Plaintiff

assured Dr. Amin that she had no issues being scheduled for a night float rotation.  (Compl. ¶ 30.)

Following this exchange, Dr. Amin scheduled Plaintiff for the night float rotation for November and

December 2010, and re-assigned Plaintiff to the night float rotation for January 2011.  (Compl.

¶ 31.)  Consequently, Plaintiff was scheduled to work the night float rotation for ten consecutive

weeks.  (Compl. ¶ 31.)

Night float rotations require residents to work from 5:00 p.m. to 7:00 a.m.  (Compl. ¶ 31.)

In practice, however, residents must stay until the attending physician arrives for morning rounds.

(Compl. ¶ 31.)  Despite Plaintiff updating the daytime hospital personnel of patient statuses and

conditions, rounds typically were completed between 9:00 a.m. and 11:00 a.m. or 12:00 p.m. daily.

(Compl. ¶ 32.)  Thus, Plaintiff worked in excess of the guidelines set by the ACGME, which she

raised to her superiors, but was ignored.  (Compl. ¶ 33.)  Plaintiff alleges that the Residency

Program violated ACGME guidelines that limit duty hours for first-year (PGY-1) residents by

scheduling her to work for night float rotations for ten consecutive weeks, thereby exceeding

maximum hours permitted.[4]  (Compl. ¶ 33.)  As a result, Plaintiff asserts that she regularly worked

between 85-95 hours per week.  (Compl. ¶ 34.)  Plaintiff alleges that Dr. Amin scheduled

consecutive night rotations, because Plaintiff did not reciprocate Dr. Watkins' sexual advances and

because Plaintiff complained to Ms. Lunn.  (Compl. ¶ 35.)

In March or April of 2011, all residents completed anonymous and confidential faculty

evaluations.  (Compl. ¶ 37.)  Subsequently, in late April 2011, faculty members whom Plaintiff

---

[4]      Plaintiff included excerpts from the ACGME Requirements, including: "Duty hours must
be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call
activities and all moonlighting," "Duty periods of PGY-1 residents must not exceed 16 hours in
duration," and "PGY-1 residents should have 10 hours, and must have eight hours, free of duty
between scheduled duty periods."  (Compl. at ¶ 33.)

anonymously criticized for making racially motivated comments[5] towards her and for not adequately training residents gave her poor evaluations for her March 2011 family medicine rotation. (Compl. ¶ 38.) Due to poor evaluations during her first-year of residency and low scores on the in-service examination, Dr. Jackson extended Plaintiff's residency for an additional six months and placed her on probation. (Compl. ¶ 38.) After receiving poor evaluations for the second time during her extended residency period at the family medicine rotation, Plaintiff indicated to Dr. Jackson that three faculty members graded her negatively because of her race. (Compl. ¶ 39.) Plaintiff alleges that Dr. Jackson became upset by the accusations. (Compl. ¶ 39.)

Following this discussion with Dr. Jackson, Plaintiff took a leave of absence to prepare for her third board examination, which Plaintiff passed. (Compl. ¶ 40.) When Plaintiff returned in August 2011, Dr. Agbeibor, an African-American, replaced Dr. Jackson as the Residency Program director, and Plaintiff was scheduled to complete another family medicine rotation with Dr. Sherrod, a white male, who Plaintiff previously alleged made negative remarks to her about African-Americans. (Compl. ¶ 42.) Following her third family medicine rotation, Dr. Sherrod and Dr. Amin issued to Plaintiff a third failing grade for that rotation. (Compl. ¶ 42.) A second six-month period was added to her residency. (Compl. ¶ 42.)

Plaintiff was neither given a formal evaluation by faculty members, nor informed of advancing to a second-year residency contract, PGY-2. (Compl. ¶ 43.) However, Plaintiff did receive a first-year certificate in July 2012, but the Residency Program did not offer Plaintiff a PGY-2 contract until late September 2012, after two years and three months as a first-year resident. (Compl. ¶ 43.) Plaintiff alleges that in the late summer of 2012, despite receiving her first-year

---

[5]    Plaintiff specifically mentions comments made by Dr. Sherrod in reference to an African-American football player, calling him a "big son of a gun." (Compl. at ¶ 36.) Further, Plaintiff alleges that Dr. Sherrod chided Plaintiff for having no knowledge of General Thomas "Stonewall" Jackson, because she was raised in Jamaica. (Compl. at ¶ 36.)

certificate, she remained scheduled in the role of a first-year resident and continued to only be assigned responsibilities for first-year residents. (Compl. ¶ 48.) Plaintiff approached Dr. Agbeibor about the situation and her concern that she did not advance to a second-year resident because of her race and previous negative faculty evaluations. (Compl. ¶ 49.) Dr. Agbeibor instead indicated that she was not promoted to a second-year resident, because some faculty members did not trust Plaintiff's judgment. (Compl. ¶ 49.) Plaintiff alleges that the Residency Program again violated ACGME regulations, which required at least four months of advance notice that she would be denied promotion. (Compl. ¶ 44.) Thus, by not offering Plaintiff a written contract as of July 1, 2012, and instead waiting until the end of September 2012, the Residency Program again violated ACGME requirements, according to Plaintiff. (Compl. ¶ 44.)

On October 18, 2012, Plaintiff sent a text message to Dr. Lowe regarding her concerns about the intimidation, humiliation and racism that she experienced in the Residency Program. (Compl. ¶ 50.) Plaintiff included the following portion of the text message in her Complaint: "I am tired of the constant humiliation!  You can tell Agbeibor that if it continues I will be in touch with the NAACP.  Even though he can't see why he was hired and quickly promoted to program director to shut up allegations of racial discrimination and to get all the dirty work done thy [sic] will quickly see through it!!" (Compl. ¶ 50.) Plaintiff alleges that Dr. Lowe then shared the contents of the text message and concerns of racial animus with Dr. Agbeibor and other faculty members of the Residency Program. (Compl. ¶ 50.) Thereafter, Dr. Agbeibor admonished Plaintiff for arriving fifteen minutes late to her rotation. (Compl. ¶ 51.)

On October 31, 2012, Plaintiff met with Dr. Agbeibor, seeking to have her semi-annual evaluation completed. (Compl. ¶ 52.) Dr. Agbeibor informed her that Dr. Sherrod gave her another failing grade for her family medical service rotation. (Comp. ¶ 52.) Plaintiff then discussed rumors other residents relayed to her that the Residency Program officials wanted her to quit, and Plaintiff

stated that she would voluntarily resign.  (Compl. ¶ 53.)  Dr. Agbeibor provided a blank sheet of paper and instructed her to write a letter of resignation.  (Compl. ¶ 53.)  In doing so, Plaintiff wrote that her resignation resulted from her "inability to withstand 'any further humiliation, intimidation and harassment.'"  (Compl. ¶ 53.)  Dr. Agbeibor returned her statement, saying that all she could write was a one-line resignation.  (Compl. ¶ 53.)  The remainder of her complaint, he said, could be "discuss[ed] with her lawyer."  (Compl. ¶ 53.)  On November 2, 2012, Plaintiff decided to rescind her previous resignation and sent a text message to Dr. Agbeibor regarding her decision.  (Compl. ¶ 54.)  Dr. Agbeibor insisted that Plaintiff speak with a psychiatrist before returning to the Residency Program.  (Compl. ¶ 54.)  Plaintiff refused, because she had already spoken with a counselor at her church.  (Comp. ¶ 54.)  Plaintiff and Dr. Agbeibor had no further communications. (Compl. ¶ 54.)

Following Plaintiff's departure and initial resignation, three additional attending physicians submitted poor evaluations of Plaintiff regarding her performance on previous rotations.  (Compl. ¶ 55.)  Plaintiff alleges that the attending physicians' evaluations were excessively negative to make Plaintiff appear to have performed more poorly than her actual performance.  (Compl. ¶ 55).  On June 24, 2013, the Chief Executive Officer of St. Francis Medical Center sent Plaintiff a letter accepting her resignation effective June 30, 2013, despite her resigning several months earlier on October 31, 2012.  (Compl. ¶ 57.)  As a result, Plaintiff alleges that the Residency Program constructively discharged her due to her initial rejection of Dr. Watkins' unwanted sexual advances and Plaintiff's subsequent complaints to the directors of the Residency Program.  (Compl. ¶ 56.)

## II.   STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation

omitted).  The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted).  Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," to one that is "plausible on its face," rather than merely "conceivable." *Id.* at 570 (citation omitted).  In considering such a motion, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citation omitted).  Legal conclusions enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.   DISCUSSION

During her time as a resident, Plaintiff alleges that she withstood racial discrimination and was subjected to retaliation because of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 and 3.  (Compl. ¶ 56.)  On June 19, 2013, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging racial and sexual discrimination, as well as retaliation.  (Compl. ¶ 58.)  The EEOC issued Plaintiff a Notice of Right to Sue.  (Compl. ¶ 58.)  Due to Plaintiff's allegation of constructive discharge from the Residency Program, Plaintiff allegedly has suffered lost earnings, loss of employment-related benefits and damage to her professional reputation.  (Compl. ¶ 59.)  Additionally, Plaintiff experienced extreme emotional distress, mental anxiety and humiliation due to "being forced to abandon her medical training and advancement in her chosen profession" for which she is seeking counseling and therapy.  (Compl. ¶ 60.)

Plaintiff now brings suit against Dr. Jackson and Dr. Agbeibor for violation of her Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983. (Compl. ¶¶ 66-67.) Defendants move to dismiss Counts VI and VII for failure to state a claim upon which relief may be granted, arguing that Plaintiff failed to plead facts establishing a property interest protected by the Fourteenth Amendment and did not establish that Defendants' conduct constituted state action. (Defs. Victor Agbeibor's and Paul Jackson's Mem. of P. & A. in Supp. of their Mot. to Dismiss Counts VI and VII of Pl.'s Compl. ("Defs.' Mem.") (ECF No. 9) at 4; Defs. Victor Agbeibor and Paul Jackson's Supplemental Mem. of P. & A. in Supp. of their Mot. to Dismiss Counts VI and VII of Pl.'s Compl. ("Defs.' Supplemental Mem.") (ECF No. 11) at 2.)

To establish a violation of § 1983, Plaintiff must show that a state actor (1) deprived Plaintiff of a right guaranteed by the Constitution and the laws of the United States, and (2) the deprivation was done under the color of state law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970); *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001). For the reasons that follow, the Court believes that the Complaint fails to properly allege a violation of § 1983.

### A. Plaintiff fails to establish a deprivation of a right.

Plaintiff argues that she has a constitutionally protected property interest through her alleged contract with the Residency Program. (Pl.'s Resp. to Defs.' Mot. to Dismiss ("Pl.'s Resp.") (ECF No. 15) at 8.) Defendants respond that Plaintiff's property interest based upon the alleged contract fails to constitute a protected property interest in continued enrollment in the Residency Program. (Defs.' Supplemental Mem. at 2-3.) Accordingly, Plaintiff's § 1983 claim must fail.

In analyzing a deprivation of due process under § 1983, the Court must initially focus on whether Plaintiff has been deprived of a liberty or property interest protected by the Fourteenth Amendment. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 579 (1972). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are

9

defined by existing rules or understandings that stem from an independent source such as state law." *Nofsinger v. Va. Commonwealth Univ.*, 2012 WL 2878608, at 6 (E.D. Va. July 13, 2012) (quoting *Roth*, 408 U.S. at 577), *aff'd* 523 F. App'x 204 (4th Cir. 2013)).   Plaintiff must identify a state statute or rule that provides for a legitimate claim of entitlement under the Fourteenth Amendment. *Id.* (quoting *Roth*, 408 U.S. at 577).   To establish a protected property interest, a claimant "must have more than an abstract need or desire for it.  [Sh]e must have more than a unilateral expectation of it.  [Sh]e must, instead, have a legitimate claim of entitlement to it."  *Id.*

Continued placement in a graduate program does not constitute a recognizable property interest under the Fourteenth Amendment. *Davis v. George Mason Univ.*, 395 F. Supp. 2d 331, 335-36 (E.D. Va. 2005), *aff'd* 193 F. App'x 248 (4th Cir. 2006); *see also Nofsinger v. Va. Commonwealth Univ.*, 523 F. App'x 204, 205 (4th Cir. 2013) ("Nofsinger failed to allege a protected property interest in her continued enrollment in VCU's graduate program"); *Abbas v. Woleben*, 2013 WL 5295672, *6 (E.D. Va. Sept. 19, 2013) ("Recent decisions in this Court have held conclusively that a student does not have a property interest in continuing enrollment in an educational program."); *Shaboon v. Duncan*, 252 F.3d 722, 732-33 (5th Cir. 2001) ("Shaboon had no clearly established economic or noneconomic property interest in the [clinical program].") Therefore, Plaintiff's alleged property interest in her continued enrollment fails to establish a legitimate claim of entitlement of a right under the Fourteenth Amendment, such that Plaintiff may state a claim under § 1983.

### B. Plaintiff fails to establish that Defendants Dr. Jackson and Dr. Agbeibor acted under color of state law.

Even if Plaintiff could show a protected property interest in her continued education so as to satisfy the first requirement of a § 1983 claim, Plaintiff still cannot establish that Defendants' conduct constituted state action.   Plaintiff alleges that Dr. Jackson and Dr. Agbeibor acted under the color of state law as former and acting Residency Directors, respectively, of the Residency

10

Program and deprived her of due process by constructively discharging her following her complaints of having to work longer hours than those established by the ACGME. (Compl. ¶¶ 66-67). Plaintiff contends that the affiliation between VCU and the Residency Program suffices, such that Defendants should be considered state actors. (Pl.'s Resp. at 6-7.) Defendants respond that Plaintiff failed to plead sufficient facts to support state domination over Defendants' actions as Residency Directors of the Residency Program, a private entity. (Defs.' Mem. at 4-5.)

A claim brought under § 1983 against a state official acting under color of state law mirrors the state action requirement of the Fourteenth Amendment. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180-81 (4th Cir. 2009); *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 178 (4th Cir. 2009) ("The same analysis applies to whether an action was taken 'under color of state law' as required by § 1983 and whether the action was state action.") Affiliation or acquiescence between a private entity and the state, without more, is not sufficient to constitute state action. *DeBauche v. Trani*, 191 F.3d 499, 507 (4th Cir. 1999) ("[T]he Supreme Court has held that private activity will generally not be deemed 'state action' unless the state has so dominated such activity as to convert it into state action . . . .")

To succeed on a § 1983 claim, Plaintiff must show that "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the state." *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006). Thus, the relationship between the state actor and private entity must be such that the private actions "may be fairly treated as that of the State itself." *DeBauche*, 191 F.3d at 507.

The Fourth Circuit recognizes four exclusive situations for which a private party may be considered a state actor: (1) when the state has coerced the private actor to commit an act that would be unconstitutional if done by the state; (2) when the state has sought to evade a clear constitutional duty through delegation to a private actor; (3) when the state has delegated a

11

traditionally and exclusively public function to a private actor; or (4) when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen. *Id.* at 507-08. "If the conduct does not fall into one of these four categories, then the private conduct is not an action of the state." *Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214, 217 (4th Cir. 1993).

Plaintiff fails to establish that the state and Defendants acted in any of the aforesaid circumstances. Plaintiff does not allege that VCU coerced Dr. Jackson or Dr. Agbeibor to discharge Plaintiff. Plaintiff does not allege that VCU sought to evade a clear constitutional duty owed to Plaintiff through Dr. Jackson's or Dr. Agbeibor's actions. Plaintiff does not allege that directing a medical residency program constitutes a traditional or exclusive public function that the state delegated. Finally, Plaintiff does not allege that VCU committed an unconstitutional act against Plaintiff in enforcing the rights of a private citizen.

Plaintiff relies solely on the affiliation between VCU and the Residency Program, but mere affiliation fails to satisfy any of the four, exclusive situations where the actions of a private party transform into state action.[6] *DeBauche*, 191 F.3d at 507. Further, Plaintiff sets forth only conclusory allegations of the affiliation between VCU and the Residency Program. (*See* Compl. ¶ 4 ("*It is supposed* that VCU exercises a significant measure of control over the standards, operations, conduct and decisions regarding the training and retention of family medicine residents.")). (emphasis added). It is well-established that Plaintiff must include more than mere factual allegations, labels, and conclusions. *Twombly*, 550 U.S. at 555. "The pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally

---

[6]     Plaintiff's Response to Defendant's Motion to Dismiss Counts VI and VII included the VCU Affiliation Agreement Template ("Template") and excerpts from the Affiliation Agreement with Bon Secours St. Francis Family Medicine Program ("Affiliation Agreement") as evidence to establish a sufficiently close relationship to implicate § 1983. However, neither suggests that the state emanated dominion or such expansive control over the Residency Program or Defendants' conduct to transform a private entity into a state actor to satisfy one of the four situations.

cognizable right of action, on the assumption that all the allegations in the complaint are true." *Id.* at 555-56. Consequently, Plaintiff fails to allege sufficient factual allegations to support the legal conclusion that Defendants acted under color of state law.[7]

## IV.    CONCLUSION

Because Plaintiff fails to allege facts showing a deprivation of right and because Plaintiff fails to allege facts showing such deprivation under the color of state law, the Court recommends that Defendants' Motion to Dismiss (ECF No. 8) be GRANTED and that Counts VI and VII be DISMISSED. The Clerk is directed to file this Report and Recommendation electronically and send a copy to all counsel of record and to Robert E. Payne, Senior United States District Court Judge.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_/s/_
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: September 22, 2014

---

[7]     Plaintiff argues that limited discovery must be granted and that Defendants produce the Affiliation Agreement between VCU and the Residency Program in its entirety to determine the extent of the relationship. (Pl.'s Resp. to Defs.' Mot. to Dismiss ("Pl.'s Resp.") (ECF No. 15) at 7). However, discovery is not appropriate for a 12(b)(6) motion to dismiss, where facts alleged in the Complaint fail to "raise a right to relief above the speculative level." *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010); *see also McLean v. United States*, 566 F.3d 391, 399 (4th Cir. 2009) ("Dismissal for failure to state a claim upon which relief can be granted, operating on the assumption that the factual allegations in the complaint are true, streamlines litigation by dispensing with needless discovery and factfinding.").